## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PAMELA L. STEAD,

          Plaintiff,

v.

UNIFIED SCHOOL DISTRICT NO. 259,
SEDGWICK COUNTY, Kansas; and
JOHN ALLISON, individually and in his
official capacity,

          Defendants.

Case No. 13-cv-1378-DDC-JPO

## MEMORANDUM AND ORDER

Plaintiff Pamela Stead brings this lawsuit asserting various causes of action arising from defendants' conduct investigating, publicizing, and responding to allegations of improprieties during the administration of Kansas state assessment tests. These events ultimately led to plaintiff's resignation as principal of Enterprise Elementary School, part of Unified School District 259 in Wichita, Kansas. This matter comes before the Court on defendants USD 259 and Superintendent John Allison's Motion for Summary Judgment (Doc. 99). Plaintiff has filed a response (Doc. 115), and defendants have filed a reply (Doc. 116). After reviewing the arguments and evidence submitted by the parties, the Court grants defendants' motion for summary judgment for the reasons explained below.

### I.      Procedural Background

Plaintiff filed this action on September 11, 2013, in the District Court of Sedgwick County, Kansas (Doc. 1-1). Plaintiff's Complaint asserts 11 causes of action: (1) defamation (libel and slander); (2) false light invasion of privacy; (3) negligence; (4) breach of contract; (5) breach of the implied covenant of good faith and fair dealing; (6) intentional interference with

contract and prospective business advantage; (7) intentional infliction of emotional distress; (8) negligent infliction of emotional distress; (9) fraudulent inducement; (10) negligent misrepresentation; and (11) deprivation of civil rights under 42 U.S.C. § 1983 (specifically, deprivation of procedural and substantive due process).  On October 8, 2013, defendants filed a Notice of Removal (Doc. 1), invoking this Court's jurisdiction over federal questions under 28 U.S.C. § 1331 and its supplemental jurisdiction over pendant state law claims under 28 U.S.C. § 1367(c).  Plaintiff did not seek remand.  Nevertheless, the Court has considered whether it should exercise jurisdiction over all of plaintiff's claims, *see 1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) ("[f]ederal courts have an independent obligation to determine whether subject-matter jurisdiction exists"), and concludes that this case is properly within its federal question and supplemental jurisdiction.

## II.    Uncontroverted Facts

The following paragraphs set forth the facts material to defendants' summary judgment motion.  These facts are either uncontroverted by the parties or are viewed in the light most favorable to plaintiff, the non-moving party.[1]

---

[1] Defendants submitted the "Affidavit of Robert Winkler" (Def. Ex. D (Doc. 100-5)) as an exhibit to the memorandum in support of their summary judgment motion.  Mr. Winkler's affidavit reflects that it was sworn in Sedgwick County, Kansas before Joshua K. Westmoreland, a notary public.  However, the notary seal affixed to the affidavit identifies Mr. Westmoreland as a notary public commissioned by the state of Colorado.  Plaintiff asserts that the affidavit is therefore "invalid and should not be considered as evidence" because Mr. Westmoreland's powers as a notary public "do not extend beyond the borders" of Colorado.  Doc. 115 at ¶ 4 (citing "Kansas Notary Handbook," Pl. Ex. F (Doc 115-7)).  As a result, plaintiff controverts each of defendants' statements of fact that cites Mr. Winkler's affidavit.

But defendants cured whatever defect may have existed in Mr. Winkler's original affidavit when they submitted with their reply brief an identical affidavit from Mr. Winkler.  The second affidavit was notarized by a Kansas-commissioned notary public.  Reply Ex. D (Doc. 116-5).  As a result, where the alleged invalidity of Mr. Winkler's affidavit is the sole basis for plaintiff controverting a statement of fact, the Court deems that fact uncontroverted for summary judgment purposes.

### A.     Parties

Plaintiff was employed by Unified School District 259 for 27 years as a teacher, an assistant principal, and a principal.  Students, teachers, administrators, and parents regarded her well throughout her tenure with the District.  She was employed as principal of Enterprise Elementary ("Enterprise") in Wichita, Kansas from 2007 until March 28, 2012, when she was placed on administrative leave and resigned soon after the events that now form the basis of this lawsuit.

 Defendant Unified School District 259 (the "District") is a Kansas public school district serving much of the Wichita area.  It is the largest school district in Kansas, educating approximately 11% of all students attending public school in the state.  Defendant John Allison serves as the superintendent of the District.

### B.     Testing Policies and Procedures

Under the federal No Child Left Behind Act and related mandates imposed by the Kansas legislature, public schools must administer certain state assessment tests to their students. Schools must administer these assessments in compliance with rules, policies, and procedures promulgated by the Kansas Department of Education ("KDE") and local school districts, which aim to ensure the fairness and integrity of the test results.

The Kansas Assessment is a testing program administered by the KDE.  The reading, mathematics, and science components of the Kansas Assessment are part of the federal No Child Left Behind Act.  The Kansas Assessment's purpose, among others, aims to establish a school's total score for purposes of measuring Adequate Yearly Progress ("AYP").  The United States Department of Education uses AYP to measure the performance of public schools and compare

districts to state standards and other indicators.  A public school that fails to meet standards for AYP is subject to sanctions ranging from warnings to staff reassignments.

Each year, the KDE publishes the Kansas Assessment Examiner's Manual.  It promulgates rules and procedures schools must follow when administering the state assessments. Plaintiff knew about the 2010-11 and the 2011-12 versions of the Examiner's Manual and kept hard copies in her office.  The District trains principals and other administrators how to comply with the testing practices and protocols set forth in the Examiner's Manual.  Plaintiff attended these training sessions each year she served as Enterprise's principal.

### C.        Initial Suspicion of Misconduct by Plaintiff

Enterprise administered the fourth grade reading assessment over a four-day period beginning on March 6 and ending on March 9, 2012.  Plaintiff oversaw administration of the math, science, and reading components for all third, fourth, and fifth grade students at Enterprise. Plaintiff shared this responsibility with Christy Winn, Enterprise's Testing Coordinator.

The testing period occurred during a construction project that included two additions to Enterprise's building.  Plaintiff made numerous efforts to stop the construction because it caused noise during testing.  She did not succeed.  On Wednesday, March 7, 2012, plaintiff received notice from third, fourth, and fifth grade teachers that several students had complained that the loud construction noise prevented them from focusing and performing to the best of their abilities on the test.  Plaintiff convened a meeting of third, fourth and fifth grade teachers and Ms. Winn to discuss the problem.  Plaintiff and Ms. Winn believed that the students did not have an appropriate testing environment.  In response, plaintiff and Ms. Winn decided to reactivate some of these students' tests.  According to plaintiff, she reactivated tests only for students who

4

had complained about the noise and reactivated only the sections they had complained about most.

On March 6 and 8, Jamie Junker, an "instructional coach"—a teacher who helps other teachers with teaching strategies, models lessons, and facilitates staff development—helped administer the test in Ms. Aaryn Ludens' fourth grade classroom.  In the spring of 2012, Enterprise administered a majority of its standardized testing on computers.  Teachers instructed students to raise their hands when they had completed their tests.  A teacher would then look to confirm that the student had answered every question on the test and, if so, would log the student out of the testing system.  Ms. Junker observed one student had completed the third section for that day's reading assessment, the last section the students completed before they broke for lunch.[2]  Ms. Junker helped the student log out of the testing system.  She then accessed the computerized system ("CETE")[3] and observed that the student received a score that the guidelines designate as "approaching standards" but not as a passing score.[4]

After the lunch break, Ms. Junker was working in the same fourth grade classroom.  She was conducting a model teaching lesson for Ms. Ludens.  Ms. Junker noticed that the student she had seen complete but not pass the test was not in the classroom for the lesson, and he remained absent for an extended period.  She learned that the plaintiff had called the student into her office to discuss his performance on the reading assessment.

[2] The Court notes that the parties identified this student by his initials in their summary judgment briefs and exhibits, which was sufficient for purposes of this motion.  To protect the student's privacy, the Court has refrained from disclosing them in this Memorandum and Order.

[3] The Center for Education Testing and Evaluation ("CETE") is a private company hired by the KDE to write the state assessment.  Unified School District 259 (and other districts in Kansas) also use CETE software to administer computerized exams and maintain testing data.

[4] The Examiner's Manual lists five categories of scores:  "Academic Warning" (not close to passing); "Approaches Standards" (close to passing, but not passing); "Meets Standards" (passing); "Exceeds Standards"; and "Exemplary."

The next Monday, Ms. Junker logged into the CETE system and discovered that it showed a new score for that particular student. His score no longer "approached standards." Instead, the system showed that he had "passed" the assessment. It also revealed that he had been permitted to retake all three of the sections of the March 8 exam because his test had been "reactivated."

A student whose test is reactivated takes exactly the same test posing exactly the same questions as the student took the first time. The Examiner's Manual provides that "[i]n some rare circumstances, it is necessary to reactivate a student's session due to a student not completing an entire test part due to a power failure, loss of internet connection, or not finishing in one sitting." None of these circumstances had occurred during this student's testing period. Having learned that this student's test had been reactivated after personally observing him complete sections one and three of his exam, Ms. Junker contacted district administrators. She reported that she believed plaintiff was "cheating" and not following the guidelines in the Examiner's Manual. Specifically, Ms. Junker believed plaintiff was allowing students who did not pass the test to retake sections of the test until they achieved a passing score. Within 24 hours of learning this information, Superintendent Allison contacted KDE Deputy Commissioner Brad Neuenswander.

### D.    Enterprise's "Suspect" Reactivations

This incident was not the only time Enterprise reactivated students' exams during the spring 2012 state assessments. Enterprise reactivated many other tests during this round of assessments. The reactivations cited, among others, the following reasons: "construction noise," "[f]lew through test," "did not do his best," "anger problems," "[e]motionally disturbed student out of control," and "students not being taught how to use a computer." Plaintiff testified that

6

she believed each of these reasons was a proper basis for reactivating a student's test.  Plaintiff had reactivated assessments prior to the 2011-2012 school year for reasons including "technology issues," "illness," and "failure to take medication."  She was not questioned, investigated, or disciplined for these reactivations.

Following Ms. Junker's report, Superintendent Allison contacted Bob Winkler, a consultant hired by the District to help prepare for the state assessment and facilitate use of the CETE system.  At Superintendent Allison's request, Mr. Winkler contacted CETE and obtained documentation about the test reactivations at Enterprise.  After reviewing this reactivation documentation, Mr. Winkler concluded that the reactivations at Enterprise were "suspect."  It appeared to him that someone at the school had reactivated students' tests so that students could retake their tests and achieve a higher score.

Specifically, and with one exception, Mr. Winkler noted that the reactivated students had completed their exams fully.  According to Mr. Winkler, the absence of omitted answers in a reactivated exam is a strong indicator that the reactivation is suspect.  He noticed other suspicious patterns.  For example, the school reactivated tests part-by-part, beginning with part one, until a student received a "passing score."  At that point, no further parts were reactivated. In other words, if a student did not achieve a passing score after retaking part one, then the school also would reactivate part two.  If the student still failed to achieve a passing score after retaking parts one and two, Enterprise would reactive part three.  But if the student achieved a passing score after retaking part one, Enterprise would not reactivate part two.  Mr. Winkler testified that this pattern was the principal indicator of suspect reactivations.

Mr. Winkler flagged a total of 15 students whose reactivations were suspect.  He identified these 15 students based on information showing that:  (1) their original tests did not

contain any omitted answers, and (2) test parts were reactivated sequentially until the student

achieved a passing score, and then the reactivations stopped.  Mr. Winkler forwarded this

information to the KDE, who then provided it to the District.  Mr. Winkler also met personally

with District administrators and officials at the KDE.

### E.      Reactivation Documentation Procedures

The Examiner's Manual and KDE specify documentation requirements that schools must

follow when certain situations arise during testing.  The Manual refers to these as "Special

Coding" (or "SC") situations.  The Manual states that "[f]or SC Codes marked 'Call KSDE,' call

the KSDE Assessment Helpline."  In other words, when certain Special Coding situations arise,

the school must contact the KDE.  "No effort" (*i.e.*, the student was not trying) is a Special

Coding situation that requires the school to contact the KDE.  Plaintiff permitted at least one

student to retake an exam because she did not believe the student put forth his or her best effort.

Plaintiff did not contact the KDE's Assessment Department about this "no effort" reactivation.

The District also maintains its own policies governing testing procedures.  As part of

these testing policies, it requires schools to maintain a "Reactivation Log," documenting each

reactivation along with the reason for it.  The purpose of a Reactivation Log is to prevent

administrators from reactivating tests solely to improve scores and to protect administrators from

accusations based on legitimate reactivations.  Several weeks before Enterprise's spring testing

sessions, the Assessment Office had emailed plaintiff a copy of the Reactivation Log template.

Plaintiff understood it was each school's responsibility to maintain a Reactivation Log.

On March 16, 2012, after receiving Ms. Junker's report about a suspicious reactivation,

the District requested all of its schools to submit their reactivations logs for review by March 28,

2012.  When she received the District's request, plaintiff knew that Enterprise had not completed

its Reactivation Log.  She also knew reactivations had occurred on March 9, but she still had not

completed the Reactivation Log by March 26.  On March 28, Jackie Farha, an administrator in

the District's Assessment Office, sent another email to all principals in the District, including

plaintiff.  This email reminded them that the Reactivation Logs were due that day.

### F.   Plaintiff's Leave and Subsequent Investigation

That same day, Mary Whiteside, the District's Assistant Superintendent of Human

Resources, emailed Ms. Farha and other administrators requesting the Reactivation Log from

Enterprise.  Ms. Farha responded that Christy Winn, Enterprise's testing coordinator, had

informed her that the log was not yet complete.  Dr. Lisa Lutz, Director of Testing (also copied

on the email), replied that the schools should update the logs daily so that they can submit the

logs at any time.  Following that correspondence, Ms. Whiteside and Alicia Thompson,

Superintendent of Elementary Schools, held a meeting with plaintiff.  At the end of that meeting,

they decided to place her on administrative leave.  The three agreed to represent to Enterprise

employees and students that plaintiff was on personal leave, and not disciplinary leave.  After

plaintiff left the meeting, however, Richard Wirtz, another District employee, asked plaintiff why

she was taking leave and plaintiff responded, "For testing violations, I guess."  Plaintiff also told

another District principal, Carol Dunne, that the District placed her on administrative leave for

testing violations.

The District continued to investigate the Enterprise reactivations.  The District

interviewed plaintiff, Ms. Winn, Ms. Junker, Mr. Winkler, Dr. Lutz, and also Fabian Armendariz

(Former Director of Assessments), Susanne Smith (Ms. Junker's supervisor), and Debbie

Thompson (former Assessment Coordinator).  Plaintiff submitted a statement to Ms. Whiteside

and Ms. Thompson.  In it, she stated, "[w]e had approximately 15 students who I believe were all

boys . . . [who] did not pass and should have." After completing the investigation and considering the advice of others involved in it, Superintendent Allison decided to recommend nonrenewal of plaintiff's contract. He testified that he based this decision on lack of "confidence in the ability of [plaintiff] to continue to perform at an administrative level."

On April 27, 2012, Ms. (Alicia) Thompson and Ms. Whiteside held a personnel conference with plaintiff. Plaintiff's attorney, Kathryn Webb, and District General Counsel Tom Powell also attended. There, the District administrators presented plaintiff with the following three options. These options are memorialized in the Personnel Conference Summary:

(a) The administration would recommend to the Board of Education the non-renewal of [plaintiff's] employment contract with the [the District] effective July 31, 2012 [the end of the contract year];

(b) The Board of Education would allow [plaintiff] to resign her position with [the District] in lieu of non-renewal effective July 31, 2012, thus allowing her to participate in the "pre-early" retirement program (a copy of her signed letter of resignation to Mary Whiteside, Assistant Superintendent HR, was attached and considered part of the disciplinary conference);

(c) [Plaintiff] would resign her administrative position with [the District] effective July 31, 2012, and would accept employment as a teacher for [the District] for the 2012-13 school year (a copy of her signed letter of resignation from her administrative position to Mary Whiteside, Assistant Superintendent HR, was attached and considered as part of the disciplinary conference).

"Personnel Conference Summary," Defs.' Ex. R (Doc. 100-19); *see also* Pretrial Order (Doc. 95, Stip. ¶ 11). The meeting occurred on a Friday. The administrators asked plaintiff for an immediate decision but, at her request, permitted plaintiff to take the weekend to discuss the options with her husband. The following Monday, April 30, 2012, plaintiff informed the District that she would choose the second option—resigning voluntarily from her position as principal and electing to receive "pre-early" retirement benefits. She also received full salary and benefits for the remainder of the contract year, which continued to July 31, 2012. Plaintiff reached her decision with assistance from her lawyer, Ms. Webb.

10

G.     **Media Coverage**

The circumstances surrounding the investigation of state assessments at Enterprise and plaintiff's subsequent resignation was the subject of three articles published by the *Wichita Eagle*. It published the first article on April 13, 2012 (the "April 13 Article") ("Pretrial Order" (Doc. 95, Stip. ¶ 13); Defs.' Ex. T (Doc. 100-21)), the second one on May 12, 2012 (the "May 12 Article") ("Pretrial Order" (Doc. 95, Stip. ¶ 14)); Defs.' Ex. U (Doc. 100-22), and the third, an editorial, on May 17, 2012 (the "May 17 Editorial") ("Pretrial Order" (Doc. 95, Stip. ¶ 15); Defs.' Ex. V (Doc. 100-23)). According to plaintiff's allegations, these are the only three articles relevant to this case. Other than direct quotes by defendants or the District's employees, plaintiff concedes that defendants did not supply any of the information published in the articles. At plaintiff's deposition, defendants presented a copy of these three articles to plaintiff and asked her to "mark what you believe based upon your knowledge is inaccurate in these three print articles."[5]

1.     **The April 13, 2012 Article**

When defendants asked plaintiff to identify the parts of the April 13 Article she believes are inaccurate, plaintiff identified one passage. It states:

> "Test results are monitored daily to see if the score of any student has changed from one day to the next," he [consultant Bob Winkler] said. "In addition, schools are visited both by local personnel and state-level officials to see if testing protocols are being properly and completely followed."

Defs.' Ex. T (Doc. 100-21). Plaintiff testified that the language quoted in this *Wichita Eagle* article was "untrue because I think that shows that they don't monitor it daily because if they did,

---

[5] Plaintiff disputes defendants' assertion that they asked plaintiff to mark the content she believes is "untrue" (as distinguished from "inaccurate"). Plaintiff emphasizes this distinction because, she contends, it is significant under defamation law, in which "truth"—but not "accuracy"—is a defense. For purposes of defendants' summary judgment motion, the Court resolves this factual dispute in plaintiff's favor, and finds that plaintiff has conceded only the accuracy, and not the truth, of the portions of the article she did not dispute in her deposition.

all these things wouldn't be [mistakes]."  She added, "second of all, I think there's never been

local personnel or State level personnel in any building that I have ever been in."

## 2.      The May 12, 2012 Article

When defendants asked plaintiff to identify the parts of the May 12 Article she believes

are inaccurate, plaintiff identified six passages.  The first passage states:

> "Sure there's pressure.  The standards go up every year," [Superintendent] Allison
> said, "But . . . the ethics of teachers and administrators show[] through."

 Defs.' Ex. U (Doc. 100-22).  Superintendent Allison testified that this quote was "not

inaccurate," but given the article's discussion of a separate testing scandal in Georgia, he

understood how it could "appear that [he] was directly commenting on Enterprise."  Plaintiff

believes that the statement is untrue "because it mentions ethics."  She also believes the passage

is "offensive for the same reason."

The second passage of the May 12 Article that plaintiff believes is inaccurate states:

> "We have a pretty comprehensive system of checks and balances that we do . . .
> on a daily, weekly snapshot basis," [Superintendent Allison] said.   "We want to
> make sure that the hard work of our teachers and our administrators is validated."

Defs.' Ex. U (Doc. 100-22).  Plaintiff disputes that the District has a comprehensive system of

checks because, if so, "the number of reactivations would not have changed and changed," and

that District personnel "would have been able to have told me from the beginning that . . .

Enterprise had reactivated 18 tests and they couldn't tell me that."

The third passage of the May 12 Article that plaintiff believes is inaccurate states:

> "Those regular checks by an outside consultant were how anomalies on some
> Enterprise tests—the fact that tests were completed and then reopened, changed
> and resubmitted—first came to light," [Superintendent Allison] said.

Defs.' Ex. U (Doc. 100-22).  Plaintiff disputes again that the District has a system of "regular

checks."  She also disputes that such regular checks were the means by which the District

became aware of the suspect Enterprise reactivations.

The fourth passage of the May 12 Article that plaintiff believes is inaccurate states:

"We have some pretty careful analysis that's done.  We look for trends that would
be unusual.  We've looked at the Reactivation Logs," [Superintendent] Allison
said.

Defs.' Ex. U (Doc. 100-22).  Plaintiff again disputes that the District personnel effectively

maintain and monitor reactivation records.  Plaintiff asserts that if this were true, defendants

would have presented such records to her during one of her personnel conferences.

The fifth passage of the May 12 Article that plaintiff believes to be inaccurate states:

"Sometimes we just get so concerned with making sure that our kids give it their
best that we just start to mess with the recipe a little bit," [Board Member Betty]
Arnold said.

Plaintiff explained what she believed is inaccurate about this passage by posing the question,

"[w]ell, where is it in all of this that they were ever presented that we messed with recipe a little

bit?"  Plaintiff also testified that this comment offends her, "because they have no idea whether

we were messing with the recipe or what we were doing and that's just an unfair, uncalled for

statement."

The sixth and final statement from the May 12, 2012 Article that plaintiff believes is

inaccurate consists entirely of a quote from Board Member Betty Arnold.  It states:

"We follow all procedures, we follow protocol and we follow guidelines, and I
think it is very timely.  For many people who have just kind of gotten comfortable
with the process, it wakes them up to say, 'we really need to pay close attention.'"

Defs.' Ex. U (Doc. 100-22).  According to plaintiff, this statement is inaccurate because Ms.

Arnold did not have sufficient information at the time of the quote to support her claim that

Enterprise did not follow protocol or guidelines.  Plaintiff acknowledges that such information

13

has become known since, but maintains that Ms. Arnold did not have it when she made this statement to the *Wichita Eagle*.  Plaintiff admits that none of her alleged inaccurate statements mention her by name, but she believes it is clear the article is referencing her and the testing coordinator.

### 3.     The May 17, 2012 Editorial

The third article relied on by plaintiff is an editorial published by the *Wichita Eagle* Editorial Board on May 17, 2012.  When asked to identify any inaccurate material in the May 17 Editorial, plaintiff marked one passage, near the middle of the piece.  It states:

> Any violation of testing rules is unacceptable.  But the district seems to have thoroughly investigated the matter, and the violations appear to be isolated and don't call into question the more than 113,000 state exams the district administers each year.

Defs.' Ex. V (Doc. 100-23).  Plaintiff believes this statement is inaccurate because the district "did not thoroughly investigate anything."  She further testified that the passage offends her "because they didn't investigate.  I don't understand that."

### H.     Plaintiff's Subsequent Employment

Plaintiff is employed currently by the Catholic Diocese as principal of St. Anne Catholic School.  The Diocese has employed plaintiff in that capacity since July 1, 2013.  Plaintiff admits that no prospective employer told her that it would not hire her because of information it learned about her in the newspaper.  Nor did any prospective employer tell plaintiff that it was not hiring her because of information it received through a reference check.

## III.     Summary Judgment Standard

To prevail on a motion for summary judgment, a moving party must demonstrate that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When it applies this standard, the Court views the

14

evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245-46 (10th Cir. 2010)).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2003)).  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."  *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248-49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## IV.   Analysis

As described above, plaintiff's Complaint originally asserted 11 claims against defendants.  In the Pretrial Order, plaintiff abandoned her claims for breach of contract, negligent infliction of emotional distress, intentional infliction of emotional distress, fraudulent inducement, negligent misrepresentation, and intentional interference with contract against both defendants.  Doc. 9 at 21-22.  She also abandoned her due process and breach of good faith and fair dealing claims against Superintendent Allison but preserved those claims against the District. *Id.*; *see also* Fed. R. Civ. P. 16(e) advisory committee's note (the pretrial order supersedes all prior pleadings and controls "the subsequent course of the action unless modified by a subsequent order").

Defendants have moved for summary judgment against each of the remaining claims. The Court addresses each claim, separately, below.

### A.   Plaintiff's Procedural Due Process Claim

Plaintiff's claim under 42 U.S.C. § 1983 alleges that the District deprived her of due process rights secured by the United States Constitution (and analogous provisions of the Kansas Constitution).  "Constitutional procedural due process analysis is a two-step process in which the court first determines whether due process is even implicated, and, if it is, then determines what process is due." *Brown v. Bd. of Educ., Unified Sch. Dist. No. 333, Cloud Cnty.*, 928 P.2d 57, 68 (Kan. 1996).  At the first step, plaintiff "must establish some property or liberty interest such that the protections of the Due Process Clause are invoked." *Id.*  (citing *Curtis Ambulance v.*

*Shawnee Cnty. Bd. of Cnty. Comm'rs*, 811 F.2d 1371, 1375 (10th Cir. 1987) (holding that due process requirements come into play only if plaintiff establishes the existence of a liberty or property interest)).

### 1.    Property Interest Analysis

The property interest plaintiff must establish at step one "is not inherent in the Due Process Clause but must be rooted in state law." *Id.* at 68-69 (citing *Bishop v. Wood*, 426 U.S. 341, 344 n. 7 (1976)). "[A] property interest in continued employment may be created by a state statute, ordinance or an implied contract." *Peterson v. Unified Sch. Dist. No. 418, McPherson Cnty., Kan.*, 724 F. Supp. 829, 831 (D. Kan. 1989) (citing *Bishop*, 426 U.S. at 344; *Vinyard v. King*, 728 F.2d 428, 432 (10th Cir. 1984). Here, plaintiff asserts that the Kansas Administrators' Act, K.S.A. § 72-5451 *et seq.*, confers a protectable property interest in her continued employment.[6]

Under Kansas law, "an administrator's expectation of continued employment extends no farther than an expectation that the school board will follow the procedures defined by" the Kansas Administrators' Act. *Brown*, 298 P.2d at 69. The rights the Administrators' Act confers on administrators are procedural and include:  (1) the right to receive notice in writing of a district's intention not to renew an administrator's contract before the third Friday in May of the contract year, *see* K.S.A. § 72-5452(a); and (2) the right, upon receiving such notice of a district's intention not to renew, to request a meeting with the district's board, at which the board must specify reasons for its decision not to renew the contract, *see* K.S.A. § 72-5453.  Kansas law is clear, "[W]hatever property rights may be created by the [Administrators'] Act are adequately safeguarded when the school board follows the Act's procedural requirements."

---

[6] The definition of administrator in the Kansas Administrators' Act is provided in K.S.A. § 72-5451(b) and includes school principals by incorporating persons designated in K.S.A. § 72-8202b (listing principals).

*Brown*, 298 P.2d at 69 (citing *Kosik v. Cloud Cnty. Cmty. Coll.*, 827 P.2d 59, 69 (Kan. 1992)).

Plaintiff asserts that defendants impaired her property interest in continued employment in two ways.  First, she claims that she "never received any sort of notice of any kind from the board."  The record contains no support for this claim.  At plaintiff's personnel conference, the District's administrators notified her of their intent to recommend nonrenewal, and presented three options to her in writing.  The first option indicated that the District's administration would recommend nonrenewal of plaintiff's contract to the Board.  "Pretrial Order" (Doc. 95, Stip. ¶ 11); "Personnel Conference Summary," attached as Defs.' Ex. R (Doc. 100-19).  The second option, which plaintiff ultimately selected, allowed plaintiff to resign voluntarily in lieu of nonrenewal.  By choosing the second option, plaintiff chose not to avail herself of the protections contained in the Kansas Administrators' Act, including the right to request a meeting with the Board (which plaintiff characterizes as a "name clearing hearing").  Plaintiff's voluntary resignation obviated the need for an official decision by the Board not to renew her contract.  By contrast, she could have triggered the Administrators' Act's protections, including a meeting and a statement of reasons for nonrenewal, had she selected the first option and declined to resign.  This option, however, carried a significant risk—plaintiff risked losing early retirement benefits because such benefits are not available to employees who are "involuntarily terminated."  *See* "Board Policy P4069:  Early Retirement Program" (Doc. 116-3 at ¶6(i)).

In sum, plaintiff received no notice from the Board only because she resigned her position before the decision came before the Board.  The uncontroverted record establishes that this personnel conference occurred on April 27, 2012 and plaintiff submitted her notice of termination on April 30, 2012.  Both events occurred before she was due official notice of nonrenewal under the Kansas Administrators' Act.  *See* K.S.A. § 72-5452(a).  Plaintiff and her

attorney both attended the personnel conference, and both signed the Personnel Conference

Summary.  No reasonable jury could find that plaintiff received "no notice," and the Court thus

concludes that plaintiff has identified insufficient facts to establish that defendants violated the

due process provisions of the Administrators' Act.

## 2.        Liberty Interest Analysis

Plaintiff next argues that defendants deprived her of a liberty interest without due

process.  Courts have recognized that the Fourteenth Amendment protects public employees'

liberty interests in their honor, reputation, or integrity.  *Bd. of Regents of State Colls. v. Roth*, 408

U.S. 564, 573 (1972) (holding that where "a person's good name, reputation, honor, or integrity

is at stake because of what the government is doing to him, notice and an opportunity to be heard

are essential." (internal quotation omitted)).  A government actor may impinge on a liberty

interest if it "impose[s] on [the public employee] a stigma or disability that foreclosed other

employment opportunities."  *Id.*; *see also Walker v. United States*, 744 F.2d 67, 69 (10th Cir.

1984).  To succeed on this claim, plaintiff must establish that defendants made statements,

which:  (1) impugned her "good name, reputation, honor, or integrity"; (2) are false; (3) occurred

in the course of her termination or foreclosed other employment opportunities; and (4) were

published.  *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994).  "These elements are not

disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest."  *Id.* (citing

*Melton v. City of Oklahoma City*, 928 F.2d 920 (10th Cir. 1991)).

The remedy in such a circumstance is that plaintiff is entitled to a "name clearing

hearing."  *Id.*  ("'When the termination is accompanied by public dissemination of the reasons

for dismissal, and those reasons would stigmatize the employee's reputation or foreclose future

employment opportunities, due process requires that the employee be provided a hearing at

which he may test the validity of the proffered grounds for dismissal.'" (quoting *Miller v. City of Mission*, 705 F.2d 368, 373 (10th Cir. 1983))).  But, as the Court has explained, the Kansas Administrators' Act already provides plaintiff a right to a "name clearing" meeting with the Board upon its recommendation of nonrenewal.  Plaintiff never triggered that provision of the Administrators' Act because she, upon advice of counsel and after consulting with her husband, elected to resign voluntarily.  A plaintiff who waives her due process rights voluntarily and upon the advice of counsel cannot later assert a due process claim alleging that those rights were violated.  *Schulze v. Bd. of Educ., Sch. Dist. No. 258, Humboldt*, 559 P.2d 367, 370 (Kan. 1977) (holding that "a public employee who has received notice of a hearing and has appeared with benefit of counsel to present evidence in his defense has waived any technical defects in the procedure and has been accorded due process."), *overruled on other grounds*, *Unified Sch. Dist. No. 380, Marshall Cnty. v. McMillen*, 845 P.2d 676, 684 (Kan. 1993).  Both conditions exist here and they establish an effective waiver of plaintiff's rights under the Administrators' Act.  Having waived these rights, including her right to a name clearing hearing, plaintiff cannot sustain a § 1983 claim under a procedural due process theory.

Plaintiff's next argument appears to challenge the validity of her purported waiver of due process rights, asserting that defendants required her to relinquish a vested property right—in this case, some $250,000 of "vested early-retirement benefits"—for the opportunity to receive notice and a hearing before the Board.

Plaintiff cites a string of cases in support of this argument.  Doc. 115 at 34 (citing *Singer v. City of Topeka*, 607 P.2d 467 (Kan. 1980); *United States v. Jackson*, 390 U.S. 570 (1968); *Sherbert v. Verner*, 374 U.S. 398 (1963); *Pfeifer v. U.S. Bureau of Prisons*, 615 F.2d 873 (9th Cir. 1980); *Kass v. Reno*, 83 F.3d 1186 (10th Cir. 1996)).  Plaintiff provides no analysis of their

20

holdings and never tries to apply them to the facts of her case. Instead, she merely claims that "[a] constitutional question arises when a party is required to relinquish a vested right as a condition for obtaining a benefit." Doc. 115 at 34. The Court has reviewed plaintiff's cases nevertheless and finds no reason to apply them to the facts presented here.[7]

### B.   Plaintiff's Substantive Due Process Claim

In addition to her procedural due process claims, plaintiff also alleges that defendants' conduct violated her substantive due process rights. Under Tenth Circuit law, "the standard for judging a substantive due process claim is whether the challenged government action would 'shock the conscience of federal judges.'" *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992)). "To satisfy this standard, 'a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power.'" *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998) (quoting *Uhlrig*, 64 F.3d at 574). Rather, a plaintiff must show "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* (quotation omitted). Whether specific conduct "shocks the

---

[7]All five cases cited by plaintiff differ from her claim here. In *Singer*, the first case cited by plaintiff, the Kansas Supreme Court held that certain statutes requiring police and firefighters to increase their pension contributions by 133% without receiving a corresponding increase benefits violated the contracts clause of the United States Constitution. 607 P.2d at 477. In *Jackson*, the Supreme Court struck down a capital punishment provision in the Federal Kidnapping Act because it burdens a defendant's constitutional right to a jury trial. 390 U.S. at 570. *Sherbert* addressed an eligibility provision in South Carolina's unemployment compensation statute that the state had applied to deny benefits to a claimant who, based on religious beliefs, refused employment that required her to work on Saturday. 374 U.S. at 410. In *Pfeifer*, the Ninth Circuit held that the provisions of the Treaty on the Execution of Penal Sentences that deny transferred prisoners the right to challenge the constitutionality of their foreign convictions in the United States did not violate prisoners' due process rights. 615 F.2d at 875. In *Kass*, the Tenth Circuit considered similar challenges to the same treaty. 83 F.3d at 1186. These cases shed no light on the issues presented by defendants' motion for summary judgment.

conscience" is a question of law for the Court.  *See Perez v. Unified Gov't of Wyandotte Cnty./Kansas City, Kan.*, 432 F.3d 1163, 1168 n. 4 (10th Cir. 2005) (citing *Terrell v. Larson*, 396 F.3d 975, 981 (8th Cir. 2005)).

Here, plaintiff's factual allegations, even if true, are insufficient.  The uncontroverted record establishes that defendants acted upon a credible report of testing impropriety at Enterprise.  Defendants investigated the report, gathered records, and sought input from testing consultants and other District personnel in an effort to confirm or dispel Ms. Junker's report. Before taking any permanent personnel action against plaintiff, defendants held a personnel conference and allowed plaintiff to weigh her options with the advice of counsel.  None of plaintiff's allegations, even construed in their best light, "shock[s]" this Court's conscience, and, therefore, plaintiff cannot establish a substantive due process violation.

## C.      Defamation

Plaintiff alleges that defendants made defamatory statements to the media about plaintiff's performance, alleged improprieties during test reactivations, and her resignation.  She claims these statements harmed her reputation.

The tort of defamation includes both libel and slander.  *Dominguez v. Davidson*, 974 P.2d 112, 117 (Kan. 1999).  Truth and privilege are defenses to a defamation claim.  *Id.* at 121.  Under Kansas law, a plaintiff asserting a defamation claim must establish that defendant:  (1) uttered false and defamatory words; (2) communicated them to a third party; and (3) caused injury to plaintiff's reputation.  *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032, 1071 (D. Kan. 2006) (applying Kansas law and citing *Luttrell v. United Tel. Sys., Inc.*, 683 P.2d 1292, 1293 (Kan. Ct. App. 1984)).

Plaintiff claims certain media coverage amounts to defamatory publications.  This media coverage consists of two articles and an editorial, all published by the *Wichita Eagle*.  "It is the court's responsibility to make the initial determination that a statement is capable of conveying a defamatory meaning."  *Hobson v. Coastal Corp.*, 962 F. Supp. 1407, 1411 (D. Kan. 1997) (citing *Woodmont Corp. v. Rockwood Ctr. P'ship*, 811 F. Supp. 1478 (D. Kan. 1993)).  When it performs this function, the court must consider all the circumstances surrounding the communication.  *Id.* (citing Restatement (Second) Torts § 614 cmt. a (1989)).

During her deposition, plaintiff identified the particular parts of the articles that she believes are inaccurate.  The Court has reviewed each statement she identified to determine which, if any, are capable of conveying a defamatory meaning.

The first article was published on April 13, 2012 under the headline, "School's Test Scores Investigated—Wichita Elementary School's Principal, Test Coordinator both on Paid Leave."  "Pretrial Order" (Doc. 95, Stip. ¶ 13); Defs.' Ex. T (Doc. 100-21).  At her deposition, plaintiff identified only one passage from the article that she believed is inaccurate.  It reads:

> "Test results are monitored daily to see if the score of any student has changed from one day to the next," he [consultant Bob Winkler] said.  "In addition, schools are visited both by local personnel and state-level officials to see if testing protocols are being properly and completely followed."

Plaintiff explained that this passage is inaccurate because she does not believe that the District actually monitors the test results diligently or that state or local officials actually visit the schools to verify that they are following testing protocols.  But whether state and local officials actually visit schools or otherwise monitor test results has nothing to do with plaintiff's reputation.  Plaintiff concedes as much when she admits that this quote has nothing to do with her or Enterprise.  Moreover, this passage consists solely of a quote from Mr. Winkler, who is a

consultant, not an employee of the District or a party in this case.  Thus, even if this passage was false, it could not support a defamation claim.

The *Wichita Eagle* published the second article, the May 12, 2012 Article, under the headline "Test Violations Prompt Principal's Retirement."  Plaintiff claims that this headline is false and that its falsity resulted from the defamatory statements that defendants communicated to the paper.  To support this claim, plaintiff identified six passages from this article contain inaccurate information.  Like the passage plaintiff highlighted in the April 13 Article, four of these statements merely address the procedures the District claims it uses to monitor compliance with testing rules:

(1)  "We have a pretty comprehensive system of checks and balances that we do . . . on a daily, weekly snapshot basis," [Superintendent Allison] said.  "We want to make sure that the hard work of our teachers and our administrators is validated."

(2)  "Those regular checks by an outside consultant were how anomalies on some Enterprise tests—the fact that tests were completed and then reopened, changed and resubmitted—first came to light," [Superintendent Allison] said.

(3)  "We have some pretty careful analysis that's done.  We look for trends that would be unusual.  We've looked at the Reactivation Logs," [Superintendent] Allison said.

(4)  "We follow all procedures, we follow protocol and we follow guidelines, and I think it is very timely.  For many people who have just kind of gotten comfortable with the process, it wakes them up to say, 'we really need to pay close attention.'"

Defs.' Ex. U (Doc. 100-22).  Plaintiff asserts that these statements are inaccurate for the same reason as the passage from the April 13 Article—namely, that the District does not monitor testing as carefully as it claims.  And, for the same reasons applied to the April 13 Article, these passages are not actionable.  Even if false, these statements do not reference plaintiff and are otherwise incapable of conveying a defamatory fact about her.

The next passage plaintiff relies on from the May 12 Article is a quote by Superintendent Allison.

> "Sure there's pressure.  The standards go up every year," [Superintendent] Allison
> said, "But . . . the ethics of teachers and administrators show[] through."

Defs.' Ex. U (Doc. 100-22).  The only thing plaintiff believes is inaccurate about this statement

is that "Superintendent Allison mentions 'ethics,'" which she claims is "offensive to me because

I'm extremely ethical and it just floors me."  The May 12, 2012, article does not refer

specifically to plaintiff's "ethics" and Superintendent Allison's observation is not aimed at

plaintiff in any way.  The statement expresses an opinion about teachers and administrators in the

District, and speaks of their ethics in a generally positive light.  It therefore cannot provide the

predicate for a defamation claim.

The final passage of the May 12 Article plaintiff relies on is a quote from Betty Arnold.

> "Sometimes we just get so concerned with making sure that our kids give it their
> best that we just start to mess with the recipe a little bit," [Board Member Betty]
> Arnold said.

Defs.' Ex. U (Doc. 100-22).  Although one fairly could read Ms. Arnold's statement to speak in

generalities, when read in context, this passage is at least susceptible to an interpretation that she

was referencing plaintiff.  It appears in an article about suspected testing violations at Enterprise,

and the phrase, "mess with the recipe a little bit" could imply a factual claim of wronging by

plaintiff.  Accordingly, the Court concludes that this quote is capable of conveying a defamatory

statement about plaintiff.

The third *Wichita Eagle* publication, the May 17 Editorial, is merely an opinion piece

authored by the newspaper's editorial board.  Plaintiff identified one passage from the Editorial

that she believes to be inaccurate.

> Any violation of testing rules is unacceptable.  But the district seems to have
> thoroughly investigated the matter, and the violations appear to be isolated and
> don't call into question the more than 113,000 state exams the district administers
> each year.

Plaintiff concedes that that this statement was made by the *Wichita Eagle*'s editorial board, not by defendants.  "[A] statement in the form of an opinion is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."  *Phillips v. Moore*, 164 F. Supp. 2d 1245, 1259 (D. Kan. 2001) (citing Restatement (Second) of Torts § 566 (1977)). That is not the case here.  Although the opinion expressed in this passage might derive from the District's own claims that it monitors and investigates testing compliance thoroughly, the Court already has explained why such falsehoods cannot defame plaintiff.  *See supra*, pp. 23-24.

In sum, the Court finds that one of the eight statements that plaintiff contends are defamatory is legally capable of conveying a defamatory meaning.  "This does not mean, however, that the statement is necessarily actionable," because "[t]o survive summary judgment, the plaintiff must also present sufficient evidence for a reasonable factfinder to find that the statement is false."  *Id.*  Ms. Arnold's claim that "[s]ometimes . . . we just start to mess with the recipe a little bit," viewed in its most defamatory light, merely implies that plaintiff deviated to some extent (*i.e.*, deviated "a little bit") from testing protocol.  As applied to plaintiff, however, this statement cannot amount to actionable defamation because the uncontroverted facts establish that this statement is true.

Three uncontroverted violations of testing protocol by plaintiff are sufficient to establish the truth of Ms. Arnold's statement.  First, the Examiner's Manual provides that a reactivation based on a student putting forth "no effort" (meaning the student was not trying) is a Special Coding situation where a school must notify the KDE Assessment Helpline.  Defs.' Ex. C (Doc. 100-4).  It is uncontroverted that plaintiff permitted at least one student to retake an assessment based on insufficient effort and failed to notify the KDE Assessment Helpline.  Second, the Examiner's Manual required plaintiff to maintain a Reactivation Log.  *Id.*  It is uncontroverted

that Enterprise had not maintained a Reactivation Log as of March 26, 2012, even though the school had reactivated several tests in the preceding weeks. Third, and most importantly, the Examiner's Manual provides that an administrator should only reactivate a test "[i]n some rare circumstances" when a student fail to "complet[e] an entire test part." *Id.* The requirement that an administrator may only reactivate incomplete tests is important because it helps separate those "rare circumstances" genuinely necessitating reactivation (*e.g.*, illness, computer failure, insufficient time to answer all questions, *see id.*) from improper reactivations made solely for the purpose of increasing a student's score. "Winkler Affidavit," Defs.' Ex. D (Doc. 100-4). It is uncontroverted that all but one of the Enterprise reactivations contained no omitted answers. Plaintiff disputes that other alleged testing improprieties were, in fact, violations. But the uncontroverted record establishes *some* violations of testing protocol, even if viewed as minor and technical. These are sufficient to establish that Ms. Arnold's limited assertion that "[s]ometimes . . . we just start to mess with the recipe a little bit" is a true one, and, as a consequence, is not actionable under defamation law. *Sunlight Saunas*, 427 F. Supp. 2d at 1071 (recognizing falsity as an essential element of a defamation claim). Because no triable issue of fact exists whether any of the statements relied on by plaintiff have defamed her, the Court grants summary judgment against plaintiff's defamation claims.

### D.    False Light Invasion of Privacy

Plaintiff next alleges that defendants' statements published in the three *Wichita Eagle* articles placed her in a false light and are therefore actionable under a false light invasion of privacy theory. Kansas law recognizes causes of action for the four "invasion of privacy" tort theories set forth in the Restatement, including the false light theory. *Frye v. IBP, Inc.*, 15 F. Supp. 2d 1032, 1040 (D. Kan. 1998) (apply Kansas law and citing Restatement of Torts (Second)

27

§§ 652B-652E (1977)).  Section § 652E sets forth the elements of a false light invasion of

privacy claim:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977).

"Courts generally treat false light invasion of privacy claims in the same way that they

treat defamation claims."  *Booth v. Elec. Data Sys. Corp.*, 799 F. Supp. 1086, 1091 (D. Kan.

1992).  "The difference between defamation and false light claims lies in the expanded publicity

requirement."  *Frye*, 15 F. Supp. 2d at 1043 (citations omitted).  "In the context of a false light

invasion of privacy claim, however, publication means that 'the matter is made public, by

communicating it to the public at large, or to so many persons that the matter must be regarded

as substantially certain to become one of public knowledge.'"  *Id.* (quoting *Ali v. Douglas Cable*

*Commc'ns*, 929 F. Supp. 1362, 1383 (D. Kan. 1996)).  Plaintiff's claim satisfies the expanded

publication requirement easily because the statements by which defendants allegedly cast her in

a false light appeared in a widely circulated newspaper.

But plaintiff cannot establish the remaining elements of a false light claim, *i.e.*, that

defendants' statements placed her in a false and "highly offensive light" and that defendants

made such statements with knowledge or reckless disregard of their falsity.  As the Court

explained above, just one of the statements plaintiff relies on is even about plaintiff.  *See supra*,

Parts II.G.1-3.  And no trier of fact could conclude that this statement—"Sometimes we just get

so concerned with making sure that our kids give it their best that we just start to mess with the recipe a little bit"—is "highly offensive" to a reasonable person.  Although plaintiff testified that she is offended by the assertion that she "messed with recipe a bit," the Court already explained that the summary judgment facts establish that this statement is true.  Ms. Arnold could not have knowingly or recklessly disregarding the falsity of a true statement.  *See Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983) (noting, "in a false light privacy action, as in a defamation action, truth is an absolute defense").  Accordingly, the Court grants summary judgment against plaintiff's false light invasion of privacy claim.

### E.      Implied Covenant of Good Faith and Fair Dealing

Plaintiff alleges a violation of the implied covenant of good faith and fair dealing against the District only.  Kansas law recognizes an implied duty of good faith and fair dealing in all contracts, except at-will employment contracts.  *Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 265 (Kan. 2013) (citations omitted).  The Kansas Supreme Court has described the obligations imposed by the duty of good faith and fair dealings as follows:

> There is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  Ordinarily if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promisee.  However, essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.

*Bonanza, Inc. v. McLean*, 747 P.2d 792, 801 (Kan. 1987).  Here, plaintiff claims that the District deprived her process that she was due—a right to notice and a hearing before the Board before it nonrenewed her contract—afforded to her under the terms of the District's Administrators Employment Agreement.  Pl.'s Ex. K (Doc. 115-12 at 3).

29

The "contractual due process rights" plaintiff references, however, require only that the Board comply with the Kansas Administrators' Act when nonrenewing an administrator's contract. *See id.* (providing that "[t]he Board shall comply with KSA 72-5451 *et seq.*, regarding the procedures for nonrenewing an administrator's contract."). Plaintiff's good faith and fair dealing theory simply reasserts her § 1983 procedural due process claim. It fails for the same reasons as the § 1983 claim did. The Administrators' Act required the District to notify plaintiff of its intent to nonrenew by the third Friday in May. K.S.A. § 72-5452(a). The uncontroverted facts establish that District administrators held a personnel conference with plaintiff and her counsel on April 27, 2012 and that plaintiff submitted her letter of resignation on April 30, 2012.[8]

It was plaintiff's own waiver, and not any arbitrary or unreasonable conduct by the District, that foreclosed the additional due process rights provided in her contract and by the Administrators' Act. *See Schulze v. Bd. of Educ., Sch. Dist. No. 258, Humboldt*, 559 P.2d 367, 370 (Kan. 1977) (holding that "a public employee who has received notice of a hearing and has appeared with benefit of counsel to present evidence in his defense has waived any technical defects in the procedure and has been accorded due process"). Plaintiff's insistence that good faith is a "question of fact," and that the jury therefore must decide this question is not persuasive. Her due process theory is the only theory upon which plaintiff asserts the District breached its duty of good faith and fair dealing. Having determined that this theory fails as a matter of law, the Court grants summary judgment against this claim as well.

---

[8] In her Opposition (Doc. 115), plaintiff asserts that the Administrators' Act required the District to give notice by May 1, 2012. The Court is unsure how plaintiff arrived at this date, as K.S.A. § 72-5452(a) states clearly that a Board must issue notice of its intent to nonrenew "on or before the third Friday in May of the year in which the term of the administrator's contract expires." The Court notes, however, that the May 1 date would not change its conclusion. It is undisputed that the District held its personnel conference with plaintiff and received her resignation before May 1.

### F.      Tortious Interference With Prospective Business Relationship

Plaintiff next alleges that defendants intentionally interfered with her future business relationship with the District.  Plaintiff brings this claim against both the District and Superintendent Allison, in his individual and official capacities.

Under Kansas law, the elements of a tortious interference with prospective business advantage or relationship claim are:  (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of that relationship or expectancy by the defendant; (3) a reasonable certainty that plaintiff would have continued the relationship or realized the expectancy but for the conduct of the defendant; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.  *Ayres v. AG Processing Inc.*, 345 F. Supp. 2d 1200, 1210 (D. Kan. 2004) (applying Kansas law).  Plaintiff asserts that Superintendent Allison and the District knew of a business relationship between plaintiff and the District and knew of her expectation of future economic benefit from that relationship.

This claim, as it applies to the District, is puzzling.  It alleges that the District tortuously interfered with plaintiff's expected business relationship with the District.  The tort of intentional interference with prospective business relationship (or contract) protects existing or expected contractual relationships with *third parties*.  *See* Restatement (Second) of Torts § 766B (1979) (the tort requires that defendant induced, prevented, or otherwise caused "a *third person* not to enter into or continue the prospective relation") (emphasis added) (cited in *Turner v. Halliburton Co.*, 722 P.2d 1106, 1115 (Kan. 1986))).  As a result, a person or entity cannot tortuously interfere with its own contract or expectancy.  *Diederich v. Yarnevich*, 196 P.3d 411, 418 (Kan. Ct. App. 2008) (holding that "one cannot tortiously interfere with a contract unless he or she is a

31

third party unrelated to the contract" (citing *Clevenger v. Catholic Soc. Serv. of Archdiocese of Kansas City in Kan., Inc.*, 901 P.2d 529, 533-34 (Kan. Ct. App. 1995))).

This principle dictates the same result for the claim against Superintendent Allison in his official capacity. Kansas law is well settled that an "official of a corporation, acting for the corporation, and within the scope of his or her representation of the corporation, cannot be liable for tortious interference with a contract the corporation could legally act on." *Id.* at 418. In such situations, "[i]t is the corporation acting," not the director or officer. *Id.* Likewise, when Superintendent Allison acted in his official capacity, it was the District, not Superintendent Allison, who acted.

But even if the Court assumed that Superintendent Allison was a third party to plaintiff's business expectancy, it would not save her tortious interference claim because any advice Superintendent Allison rendered to the Board about nonrenewing plaintiff's contract was privileged. "[N]ot all interference in present or future contractual relations is tortious." *Turner*, 722 P.2d at 1115. Indeed, "a person may be privileged or justified to interfere with contractual relations." *Id.* (citation omitted). "The question of privilege is one of law to be determined by the court." *Brown Mackie Coll. v. Graham*, 768 F. Supp. 1457, 1461 (D. Kan. 1991), *aff'd*, 981 F.2d 1149 (10th Cir. 1992).

Generally, privilege applies "where public policy favors free exchange of information over the individual's interest in good reputation." *Sunlight Saunas*, 427 F. Supp. 2d at 1071 (citing *Ali*, 929 F. Supp. at 1384). Kansas law recognizes that this privilege applies to "employment communications made in good faith and between individuals with a corresponding interest or duty in the subject matter of the communication." *Lloyd v. Quorum Health Res., L.L.C.*, 77 P.3d 993, 1000 (Kan. Ct. App. 2003). The Court predicts that Kansas would find this

privilege applies especially in the context of personnel decision by a public school.  *See State ex rel. Miller v. Bd. of Educ. of Unified Sch. Dist. No. 398, Marion Cnty. (Peabody)*, 511 P.2d 705, 714 (Kan. 1973) (Observing that education is a "vital area of national concern."); *State v. Freeman*, 58 P. 959, 960 (Kan. 1899) ("The matter of education . . . concerns all the people of the state . . . .").

Kansas law assigns Superintendent Allison responsibility for "charge and control of the public schools of the school district, subject to the orders, rules and regulations of the board of education."  K.S.A. § 72-8202b(c).  Given these responsibilities, the Court concludes that Superintendent Allison, the Board, and other District administrators have shared interests and duties in the integrity of state assessments and the fitness of an individual to serve as a principal in the District.  The allegedly tortious communications at issue here are precisely the type of communications Kansas' law intended to shield from tortious interference claims.

Where a privilege exists, the burden shifts to plaintiff to prove "'not only that the statements were false, but also that the statements were made with actual malice—*with actual evil-mindedness or specific intent to injure*.'"  *Turner*, 722 P.2d at 1113 (quoting *Munsell v. Ideal Food Stores*, 494 P.2d 1063, 1073 (1972)).  Plaintiff has produced no evidence that could support a rational finding that Superintendent Allison acted with an evil mind or a specific intention to injure plaintiff.  Plaintiff's tortious interference claims against Superintendent Allison in his official capacity therefore fail as a matter of law because his advice was privileged and his conduct is chargeable to the District itself, a first—not a third—party to plaintiff's purported business expectancy.

This leaves just one more iteration of plaintiff's tortious interference claim.  She alternatively asserts Superintendent Allison's conduct in his individual capacity is not chargeable

to the District itself.  Plaintiff's claim against him in his individual capacity at least states a legally actionable claim because, in his non-official capacity, Superintendent Allison qualifies as a third party to plaintiff's business expectancy with the District.  *See Diederich*, 196 P.3d at 419. But in order to establish that Superintendent Allison acted in his individual capacity, plaintiff must establish facts showing that he acted "outside the scope of [his] employment" or "for [his] own individual advantage" when he investigated plaintiff and solicited her resignation.  *Id.* at 418.  Aside from merely naming Superintendent Allison "in his individual capacity," plaintiff has not set forth any facts upon which a trier of fact could conclude that he acted outside the scope of his employment at any time relevant to this suit.  And the uncontroverted record forecloses such a finding.  Accordingly, the Court grants summary judgment against plaintiff's tortious interference claim.

## G.        Negligence

Plaintiff next alleges a broad negligence claim against both defendants.  The Pretrial Order required plaintiff to identify the purported duties establishing the basis for her negligence claim.  She identified the following duties:

(1) To know and understand the applicable testing standards for the relevant testing period; to determine whether any violations of testing standards had occurred prior to placing [plaintiff] on administrative leave;

(2) To contact state authorities to clarify any issues with respect to whether violations of testing standards had occurred;

(3) To conduct a thorough, proper, and accurate investigation into the applicable testing and reactivation protocol in place for the relevant testing period and the circumstances of [plaintiff's] decision to reactivate;

(4) To obtain a properly completed reactivation log prior to taking disciplinary action against [plaintiff];

(5) To provide to [plaintiff] a written account of the matter that was under investigation and to obtain complete and accurate information from all witnesses including those identified by [plaintiff]; and

(6) To refrain from making statements to the media and other third-parties regarding an internal personnel matter and from making defamatory remarks regarding [plaintiff]; and to protect against the injuries and damages sustained by [plaintiff].

Doc. 95 at 16-17.

Defendants assert that they are entitled to summary judgment against plaintiff's negligence claim because this claim is barred by the discretionary function exception to the Kansas Tort Claims Act ("KTCA"). *See* K.S.A. § 75-6104(e). This exception grants governmental entities and their employees immunity from tort claims if the claims are:

> based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved.

*Id.* "[T]he KTCA is an 'open-ended' act; liability is to be the rule while immunity is to be the exception." *Burgess v. West*, 817 F. Supp. 1520, 1524-25 (D. Kan. 1993). "[T]he burden is upon the defendant governmental entity to establish immunity under one or more of the exceptions of K.S.A. 75-6104." *Conrad v. Bd. of Johnson Cnty. Comm'rs*, 237 F. Supp. 2d 1204, 1260 (D. Kan. 2002).

To determine whether K.S.A. § 75-6104(e)'s immunity rule bars plaintiff's negligence claims, the Court must determine whether the government actor's alleged tortious conduct occurred during the performance of a discretionary function. The KTCA does not supply a statutory definition for the term "discretionary function." "The critical inquiry is 'the nature and the quality of the discretion exercised rather than the status of the employee.'" *Burgess*, 817 F. Supp. at 1525 (quoting *Kan. State Bank & Trust Co. v. Specialized Transp. Servs., Inc.*, 819 P.2d 587, 599 (Kan. 1991)). But the "mere exercise of some judgment cannot be the test for a

discretionary function because '[j]udgment is exercised in almost every human endeavor.'"  *Kan. State Bank & Trust*, 819 P.2d at 600 (quoting *Downs v. United States*, 522 F.2d 990, 995 (6th Cir. 1975)).

Courts have identified several principles to guide decisions about whether the discretionary function exception applies to particular government conduct.  "First, the 'nature and the quality of the discretion' must be of the type that the Kansas Legislature intended to put beyond judicial review."  *Conrad*, 237 F. Supp. 2d at 1261 (quoting *Kan. State Bank & Trust*, 819 P.2d at 600-01).  "Second, the discretionary function exception is not applicable in those situations where a legal duty exists, either by case law or by statute."  *Id.* (citing *Nero*, 861 P.2d at 782).  "Concisely stated, the rule is that if a government official in performing his statutory duties must act without reliance upon a fixed or readily ascertainable standard, the decision he makes is discretionary and within the exception of the Tort Claims Act."  *Haehn v. City of Hoisington*, 702 F. Supp. 1526, 1533 (D. Kan. 1988).  The facts of *Haehn* illustrate this standard.

In *Haehn*, a former female police officer brought suit against a city manager for his failure to investigate properly and discipline an employee who, the officer claimed, had sexually harassed her.  *Id.*  Our Court held that the city manager's "administrative decisions on handling plaintiff's complaints and allegations . . . clearly entailed the formulation of governmental policy," and, hence, fell within the KTCA's discretionary function exception.  *Id.*; *see also Polson v. Davis*, 635 F. Supp. 1130, 1152 (D. Kan. 1986), *aff'd*, 895 F.2d 705 (10th Cir. 1990) (noting that a government employee's decision to terminate a subordinate's employment likely falls within the discretionary function exception).

The Court reaches the same conclusion about plaintiff's claim here.  The undisputed facts establish that Superintendent Allison's conduct investigating allegations of misconduct by

plaintiff and formulating an administrative response required him to exercise policymaking discretion.  The undisputed facts show that his response was not dictated by strict guidelines or mandates.  He instead relied upon his own judgment in discharging his supervisory and management duties as superintendent.  Defendants have thus met their burden to show that the "nature and the quality of the discretion" they exercised when investigating plaintiff and soliciting her resignation is the type the Kansas Legislature sought to immunize under K.S.A. § 75-6104(e).  *Conrad*, 237 F. Supp. 2d at 1261 (quoting *Kan. State Bank & Trust*, 819 P.2d at 600-01).

Plaintiff nonetheless may preclude the application of discretionary function immunity under the KTCA by establishing that a recognized "legal duty exists, either by case law or by statute."  *Id.* (citing *Nero*, 861 P.2d at 782).  Plaintiff has made no such showing.  When challenged by defendants' summary judgment motion, plaintiff could identify no statute, case law, or any other legal authority recognizing the duties she described in the Pretrial Order. Plaintiff's negligence claim therefore fails as a matter of law because defendants are immune from plaintiff's negligence claim under K.S.A. § 75-6104(e).  *See Kirk v. City of Shawnee*, 10 P.3d 27, 32 (Kan. Ct. App. 2000) (affirming summary judgment for defendant City of Shawnee based on KTCA's discretionary function exception where plaintiff failed to cite any case law, statute, or written guidelines establishing the defendant owed the duties plaintiff asserted). Accordingly, the Court grants summary judgment against plaintiff's negligence claim. [9]

---

[9] Defendants argue that the Kansas Tort Claims Act bars plaintiff's other claims.  The Court disagrees.  The KTCA does not provide immunity from plaintiff's defamation and false light claims, *see Polson*, 635 F. Supp. at 1153 (holding that though the KTCA shields from liability a government employee's decision to terminate a subordinate, its protections do not extend to defamatory statements to third parties about the basis for termination), breach of good faith and fair dealing claim, *see Pizza Mgmt., Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1167 (D. Kan. 1990) (holding that breach of good faith and fair dealing is a contract action, not a tort), intentional interference with business expectancy claim, *see Nielander v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan.*, 582 F.3d 1155, 1171 (10th Cir. 2009)

**IT IS THEREFORE ORDERED BY THE COURT THAT** Defendant's Motion for Summary Judgment (Doc. 99) is granted.  The Court enters summary judgment against all claims.

**IT IS SO ORDERED.**

**Dated this 13th day of March, 2015, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

---

(noting that KTCA does not bar claims against government officials for intentional torts) and her § 1983 claims, *see Kjorlie v. Lundin*, No. 91-4040-DES, 1993 WL 142823, at *10 n.11 (D. Kan. Apr. 9, 1993) (holding that the KTCA does not apply to § 1983 claims).